UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

FILED
98 JAN 16 AM 10: 58
U.S. DISTRICT COURT
N.D. OF ALABAMA

WYLODEAN H. EDDINGS,         )
                              )
     Plaintiff,              )
                              )
vs.                          )    Civil Action No. CV-96-S-1474-S
                              )
NORSTAN, INC; and NORSTAN    )
COMMUNICATIONS, INC.,        )
                              )
     Defendants.             )
                              )

**ENTERED**

**JAN 1 6 1998**

### MEMORANDUM OPINION

This lawsuit comes on the heels of Wylodean H. Eddings' discharge after a three month stint as customer service representative for defendants Norstan, Inc. and Norstan Communications, Inc. (hereinafter "Norstan") in Birmingham, Alabama. Plaintiff, 62 years old at the time of her discharge, contends that her discharge was a willful violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. §§ 621 et seq. She filed this suit on June 7, 1996. The matter now is before this court on defendants' motion for summary judgment. Upon review of the motion, briefs, evidentiary submissions, and pleadings, the court concludes that defendants' motion is due to be denied.

### I. SUMMARY OF FACTS

Minnesota-based Norstan, a provider of business telephone and voicemail equipment and services, began expanding southward in August, 1991. (Egan Deposition at 18-20; Defendants' Exhibit 13.) As part of that expansion, Norstan opened and began staffing a

branch office in Birmingham, Alabama in January of 1992. (Babin Deposition at 7.) Wylodean H. Eddings was then employed in the Birmingham, Alabama, office of Wiltel Communications, a Norstan competitor.[1] (Eddings Deposition at 31, 35-37; Defendants' Exhibit 10.) For nine of her 13 years with Wiltel, plaintiff worked as a customer service representative (CSR).[2] (Defendants' Exhibit 10.) In that position, plaintiff's duties included "attending all Customer Meetings, Scheduled Dates with Customer for Cutover, Database Collection and Input, Training of End Users and Follow-Up with Customer after Cutover. [She a]lso was responsible for Customer Relations with Existing Customers." (Id.; see also Eddings Deposition at 36-37, 42-48, 54-65.)

Norstan employee JoAnn Cangelosi, a former co-worker of plaintiff at Wiltel who apparently knew her friend's talents, recommended plaintiff to fill the position of CSR in Norstan's new Birmingham office.[3] (Eddings Deposition at 124, 160-61, 172-73.) John Crosby Smith, operations manager for the New Orleans and Birmingham branches,[4] and Sally Egan, director of operations for

---

[1] The company was originally known as Fisk Telephone Systems, and later as Centel Communications. The date on which the firm's names changed is not revealed in the record before the court.

[2] A CSR is also referred to as a project coordinator. (Smith Deposition at 15-16; Snead Deposition at 8-10.)

[3] This point is disputed. The court, however, considers the evidence in the light most favorable to plaintiff, as it must. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970) Even so, what the court states as facts in this opinion "may not be the actual facts. They are, however, the facts for present purposes." Montoute v. Carr, 114 F.3d 181, 182 (11th Cir. 1997) (quoting Swint v. City of Wadley, 51 F.3d 988, 992 (11th Cir. 1995)).

[4] Smith apparently assumed responsibility for the Birmingham branch in early September of 1992, somewhat before the date on which plaintiff was hired. (Smith Deposition at 11.)

2

the southern region, each interviewed plaintiff.[5] (Smith Deposition at 15-20; Eddings Deposition at 175-78, 181-83; Egan Deposition at 38-40.) During her interview with Egan, plaintiff identified her strong points: "I am very confident, and ... I [will] sit with [customers] and hold their hand for as long as they need [me] to." (Eddings Deposition at 188.) She also expressed

> concern[] about not having the knowledge of coding and defining. ... I told Sally I wanted to be sure that she understood that my strengths w[ere] not in the higher end of the technical thing, [but] that I had been used ... all over the country for training purposes and customer meetings and holding hands when cut-overs didn't go right....

(*Id.* at 182-83.) According to plaintiff, Egan responded to that explication as follows:

> [W]e have got a lot of the technical support right now, we don't need that, and we will have school later and we will see if it gets to be a problem then. ... I don't ... foresee where there would be any problem.

(*Id.* at 183.) During her interview with Smith, plaintiff described her prior work experience as a CSR: "I told him that I did all of the customer meetings, I gathered the database and helped design the system, set phones, printed phones, and did the training, and that my number one expertise was training...." (*Id.* at 174.)

Following those interviews, Egan extended an offer to

---

[5] The precise dates and sequence of those interviews is not entirely clear from the record before the court. Apparently, Smith first spoke with plaintiff by phone, then met with her in person at a later date in Birmingham. (Eddings Deposition at 172-73; 175-76.) "[T]hree or four days" later, Egan interviewed plaintiff in Birmingham over lunch. (*Id.* at 181-82.) A face-to-face meeting among all three may have taken place shortly thereafter in Birmingham. (Smith Deposition at 18-20.) In any event, it is clear that both Egan and Smith interviewed plaintiff in person before she was hired, and each was aware of her prior work experience with Wiltel. Additionally, there is evidence that Egan made the final decision to hire plaintiff only after Smith had met and approved of her. (Eddings Deposition at 178.)

3

plaintiff by letter dated September 14, 1992: "I am delighted to offer you the position of Project Coordinator/CSR.... This letter confirms that you will begin employment with us on September 21, 1992." (Defendants' Exhibit 13; Egan Deposition at 61.) Plaintiff did, in fact, begin working for Norstan on that date.

Plaintiff attended several training classes at Norstan's instigation, including one week-long session conducted at Norstan's New Orleans office, and others covering various types of telephone systems and features. (Eddings Deposition 193-98.) She passed a test at the end of each of those courses, and the "instructors indicated that I did fine." (*Id.* at 203, 210-11.) Plaintiff claims she was given little work to do during her three months with Norstan, other than telephoning potential customers to let them know she was now working for Norstan. (*Id.* at 211-33, 248; Egan Deposition at 89; Babin Deposition at 17-18.) She apparently was given little responsibility for the five projects then in the office. (Eddings Deposition at 211-33.) Even so, "[f]rom the time I started there until the day I left, they had always told me that everything had been outstanding." (*Id.* at 254.)

On December 21, 1992, Egan and Smith met with plaintiff and Smith told her "you just can't cut it." (*Id.* at 246-47.) Although plaintiff asked for an explanation, "he never did tell me nor did Sally tell me what I couldn't do. ... I didn't know what in the world that I was doing wrong and ... I had no way of knowing that anything was wrong." (*Id.* at 249.) At the end of the meeting,

4

Egan and Smith terminated plaintiff's employment. This lawsuit followed.

## II. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment

> shall be granted forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997)(citing *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, the burden shifts to the nonmoving party to point out "specific facts showing that there is a genuine issue for trial." *Id.* (quoting Fed. R. Civ. P. 56(e)). In meeting its burden, the nonmoving party may "avail

5

itself of all facts and justifiable inferences in the record taken as a whole." *Id.* (quoting *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citations omitted)). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Allen*, 121 F.3d at 646 (quoting *Tipton*, 965 F.2d at 999 (citations omitted)). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* (quoting *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990)).

### III.   AGE DISCRIMINATION IN EMPLOYMENT ACT

In unlawful age discrimination cases, plaintiff has the ultimate burden of proving that age was a determining factor in the employer's decision to terminate her employment. *Clark v. Coats & Clark, Inc.*, 990 F.2d 1217, 1226 (11th Cir. 1993). Initially, plaintiff must establish that age was a determining factor in the employer's decision with direct evidence,[6] circumstantial evidence, or statistical evidence. *Alphin v. Sears, Roebuck & Company*, 940 F.2d 1497, 1500 (11th Cir. 1991). plaintiff has presented no direct or statistical evidence of discrimination. Rather, she relies on circumstantial evidence. Therefore, to avoid summary judgment on her age discrimination claim, she must comply with the framework created for such cases by the Supreme Court in a trilogy

---

[6] "Only the most blatant remarks, whose intent could only be to discriminate on the basis of age constitute direct evidence." *Coats*, 990 F.2d at 1226.

6

of decisions rendered over a period of 20 years, beginning with *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817 (1973), then elaborated in *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089 (1981), and finally elucidated in *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742 (1993). The analytical framework developed by that trilogy has three steps.[7]

First, plaintiff's presentation of evidence establishing a *prima facie* case "creates a rebuttable presumption of unlawful discrimination." *United States v. Crosby,* 59 F.3d 1133, 1135 (11th Cir. 1995)(citation omitted). Next, the defendant may rebut the presumption established by the *prima facie* case "by articulating a nondiscriminatory reason for its actions." *Id.* (citation omitted). Finally, if the defendant satisfies its burden of articulating a nondiscriminatory reason for its actions, the presumption of discrimination "simply drops out of the picture," and the sole inquiry becomes whether the plaintiff has proven intentional discrimination. *Id.* (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 S.Ct. 2742, 2749, 125 L.Ed.2d 407 (1993). The goal of that three-step process is to "progressively ... sharpen the inquiry into the elusive factual question of intentional discrimination." *St. Mary's Honor Center,* 509 U.S. at 506, 113 S.Ct. at 2746 (quoting *Burdine,* 450 U.S. at 255 n.8, 101 S.Ct. at

---

[7] Although those cases involved discrimination claims under Title VII, a variant of the analysis applies to claims under the ADEA as well. *Alphin v. Sears, Roebuck & Company,* 940 F.2d 1497, 1500 (11th Cir. 1991).

7

1094 n.8).

## A. Plaintiff's *Prima Facie* Case

In a case such as this, where plaintiff was replaced by another employee, a *prima facie* case of age-based termination is established by showing that plaintiff: (1) was a member of a protected group; (2) was qualified to do the job; (3) was discharged; and (4) was replaced by someone outside the protected group. *Zaben v. Air Products & Chemicals, Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). Plaintiff has plainly established the first, third, and fourth prongs of a *prima facie* case: she was 62 years old at the time of her termination, and she was replaced by a 30 year old, Patti Hester. Norstan challenges only the second prong of the *prima facie* case; *i.e.*, whether plaintiff was qualified for the position.

Norstan presents no substantive argument on this point, but states that

> Critically, Plaintiff cannot prove ... that she was qualified to do the job. It is undisputed that Plaintiff was unable to step in and take over as the project coordinator/CSR with the minimal training and assistance that Egan and Norstan anticipated and provided.

(Defendants' Brief in Support at 9.) Plaintiff's burden, at this stage of the case, is slight. She must show only that she met the objective qualifications for the position, not Norstan's subjective standards. *See, e.g., Lindsey v. Prive Corp.*, 987 F.2d 324 (5th Cir. 1993)("Subjective criteria should not be considered a part of the *prima facie* case evaluation in a summary judgment proceeding").

8

The Eleventh Circuit has recognized that

> any disagreement between parties regarding whether a particular plaintiff was adequately performing his job would be brought out at the stage of the proceedings when the defendant articulates legitimate reasons for the discharge and the plaintiff shoulders his burden of proving that the reasons are pretextual.

*Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). Thus, Norstan's subjective considerations are more appropriately addressed at the third stage of the *McDonnell-Douglas* analysis.

Plaintiff presented evidence that she was employed by a Norstan competitor for nine years as a CSR. JoAnn Cangelosi, who was plaintiff's co-worker at Wiltel for a time, witnessed Edding's performance in that job firsthand. Cangelosi was herself later employed by Norstan as a CSR, and thereafter recommended plaintiff for the CSR position in Birmingham. Given Cangelosi's knowledge of plaintiff's capabilities and also Norstan's expectations, plaintiff has demonstrated that she was qualified for the position of CSR and, thus, has presented a *prima facie* case.[8] The court's focus now shifts to Norstan.

### B. Defendants' Nondiscriminatory Reason

Plaintiff's *prima facie* case having given rise to a

---

[8] Defendants state in a letter brief to the court that plaintiff's evidence regarding Cangelosi's alleged recommendation is inadmissible hearsay. The Eleventh Circuit holds, however, that "otherwise admissible evidence [may] be submitted in inadmissible form at the summary judgment stage, though at trial it must be submitted in admissible form." McMillian v. Johnston, 88 F.3d 1573, 1584 (11th Cir. 1996), aff'd, ___ U.S. ___, 117 S.Ct. 1734, 138 L.Ed.2d 1 (1997). Although plaintiff's testimony on that subject may be inadmissible hearsay, Cangelosi's opinion of plaintiff's suitability for the CSR position is not. Indeed, Cangelosi is on defendants' witness list for trial. Thus, the court's consideration of Cangelosi's alleged endorsement is proper.

9

presumption of discrimination, the burden shifts to Norstan to "produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Burdine*, 450 U.S. at 257, 101 S.Ct. at 1096. Norstan asserts that plaintiff's subpar performance as a CSR prompted her termination:

> While Ms. Eddings was still in her probationary period, I became convinced, based on feedback I received from Crosby Smith (Ms. Eddings supervisor), and Ron Babin (the Birmingham Branch Account Executive), and the reports I reviewed of Ms. Eddings' performance in the training classes Norstan provided for Ms. Eddings, that she was not qualified for the position, particularly in light of Norstan's business need for a project coordinator/CSR who could take full control of projects for the Birmingham Norstan Branch. I had come to believe that Ms. Eddings was not capable of growing into the job as quickly as Norstan needed her to do so, even with additional training and support.

(Defendants' Exhibit 7, ¶ 7.) Smith, plaintiff's supervisor, determined that she was not able to handle the job based on feedback he received from her instructors and co-workers:

> [I had] just a lack of confidence that she could take a position and move forward with it. We were at a point where we needed to invest further dollars in additional manufacturer training and the feedback we were getting from just the basic training that she attended was that she was having problems understanding basic components of the curriculum.... [T]he reason she was hired for the position ... was that we had an investment to send people from New Orleans to manage the projects there. And we could see ... toward the end of her employment that that investment was going to continue.

(Smith Deposition at 75-76.) According to Smith, one of plaintiff's instructors "expressed some concerns about Deana's performance in the training and ability to comprehend the

10

material." (*Id.* at 60.) Moreover, David Snead, one of the technicians in Birmingham who worked with plaintiff, allegedly told Smith that she was not ready to tackle an upcoming project alone:

> [H]e had indicated concern ... that if Deana were the project coordinator that ... we would not meet the cutover date and that his involvement would be much greater than that of technician, that he would be programming the system and gathering the database, the normal things the project coordinator does.

(*Id.* at 57.)

It is important to note that "defendant need not persuade the court that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094. Rather, "this 'burden of proof' is to be understood as a burden of production, not persuasion." *Busby v. City of Orlando*, 931 F.2d 764, 77 n.12 (11th Cir. 1991)(citing *Wards Cove Packing Co. v. Antonio*, 490 U.S. 642, 660, 109 S.Ct. 2115, 2126, 104 L.Ed.2d 733 (1989)). Defendants' proffer of a legitimate, nondiscriminatory reason for its decision "destroys the legally mandatory inference of discrimination arising from the plaintiff's initial evidence." *Burdine*, 450 U.S. at 256 n.10, 101 S.Ct. at 1095 n.10. Thus, the burden now shifts back to plaintiff.

C. **Pretext**

After the initial presumption of discrimination has been eliminated, "the factual inquiry proceeds to a new level of specificity." *Burdine*, 450 U.S. at 255 & n.10, 101 S.Ct. at 1094-

11

95 & n.10.

> [T]he new level of specificity ... refer[s] to the fact that the inquiry now turns from the few generalized factors that establish a *prima facie* case to the specific proofs and rebuttals of discriminatory motivation the parties have introduced.

*St. Mary's Honor Center*, 509 U.S. at 516, 113 S.Ct. at 2752 (citations omitted). That is, the

> district court must, in view of all the evidence, determine whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employer's proffered "legitimate reasons were not what actually motivated its conduct."

*Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)(quoting *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994)).

Plaintiff attacks Norstan's proffered explanation by directing the court to evidence that she performed her job well, completed all tasks assigned to her, and favorably impressed her co-workers and customers. Plaintiff points out that both Egan and Smith acknowledged that she did everything she was ever asked to do. (Egan Deposition at 88-90; Smith Deposition at 95.) Plaintiff was never told of any problems or dissatisfaction with her job performance. (Eddings Deposition at 244-49; Egan Deposition at 83-85; Smith Deposition at 56.) To the contrary, before her termination, the only remarks Egan and Smith addressed to plaintiff about her performance were positive ones. (Eddings Deposition at 246-47, 254.) So positive were the signals sent by plaintiff's supervisors that, when she was called into the meeting which would

12

end with her termination, she "was rather excited about it. I thought maybe that I was going to get some kind of a promotion or something. I really did...." (Id. at 247.)

Moreover, Smith admits he never received a negative comment about plaintiff from a customer. (Smith Deposition at 68, 110.) One of plaintiff's co-workers, Norstan service technician Don Bruce, testified that he had never complained or made any negative comments about plaintiff before she was fired. (Bruce Deposition at 25; Smith Deposition 63-64.) Although Smith claims the other service technician, David Snead, told him he was concerned about plaintiff's ability, Snead testified that he did not recall expressing such concerns. (Snead Deposition at 30-31.) Instead, Snead testified that customers made favorable comments about plaintiff, and he had never heard any negative comments about her work. (Snead Deposition at 21-22, 24-25.) Similarly, although Smith claims sales representative Ron Babin made negative comments about plaintiff, Babin testified that he does not recall making those comments. (Babin Deposition 21-23.) Given such conflicts between Smith's characterization of plaintiff's co-workers opinions of her work, and the co-workers' actual testimony, a jury could disbelieve Smith's contention that plaintiff was performing poorly.

Additionally, Norstan's failure to follow its written disciplinary policy in plaintiff's case could lead a jury to the conclusion that Norstan's stated reason for firing her is false. The policy sets forth a three-step process of corrective action for

13

employee performance problems. (Egan Deposition, Exhibit 30.) Step One provides, in part: "Employee is counseled by the supervisor following a minor offense or the beginning stage of a work performance problem...." (*Id.* at 3.) At Step Two, "[e]mployee receives probationary written warning following repeated minor offenses or a continuation of a work performance problem in which Step 1 has been taken...." (*Id.* at 4.) Step Three, the level at which discharge becomes an option, provides that "[p]rior to a discharge decision being finalized, the employee is provided the opportunity to present their perceptions regarding the circumstances of the situation to the Regional Human Resources Manager or the Branch General Manager." (*Id.* at 4.)

Egan contends that the policy did not apply to plaintiff because she was a probationary employee still within a 90-day trial period. (Egan Deposition at 119.) Yet, the policy includes no such limitation; instead, it expressly states that it is "a uniform policy which applies equally to all employees." (Egan Deposition, Exhibit 30 at 1.) Smith, in fact, admits that the policy applies to probationary employees "start[ing] at step two." (Smith Deposition at 101.) Nevertheless, plaintiff was never counseled about her allegedly poor performance, she was never issued a written warning, and she was not afforded an opportunity to "present her perceptions regarding the circumstances of the situation" to anyone before her discharge became final. (Smith

14

Deposition at 99-103.)[9]

In assessing plaintiff's evidence of pretext, this court must evaluate whether that evidence demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Combs*, 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont De Nemours & Co.*, 100 F.3d 1061, 1072 (3rd Cir. 1996)(en banc)(citation and internal quotation marks omitted)). This court so finds.

For the foregoing reasons, the defendants' motion for summary judgment is due to be denied. An order consistent with this memorandum opinion shall be entered contemporaneously herewith.

DONE this 16th day of January, 1998.

_____
United States District Judge

SCANNED
JAN 1 6 1998
BY

---

[9] Norstan also urges this court to adopt the "same-actor" presumption articulated by the Fourth Circuit in *Proud v. Stone*, 945 F.2d 796 (4th Cir. 1991), but the court declines the invitation. Such a presumption would be improper here because there is evidence that the "same-actor" did not make both the hiring and firing decisions in this case. Although the decision to hire plaintiff was apparently made by Egan alone, the "actual decision [to terminate her] was jointly made by Sally Egan and Crosby Smith." (Defendants' Response to Plaintiff's First Interrogatories, Number 3, attached as Plaintiff's Exhibit A.)

15